# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

          v.

RUBEN FLORES-VILLAR,
                    *Defendant-Appellant.*

No. 07-50445

D.C. No.
CR-06-00592-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
July 17, 2008—Pasadena, California

Filed August 6, 2008

Before: Cynthia Holcomb Hall, Pamela Ann Rymer, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Rymer

## COUNSEL

Elizabeth M. Barros, Assistant Federal Public Defender, San Diego, California, for the defendant-appellant.

William A. Hall, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

## OPINION

RYMER, Circuit Judge:

Ruben Flores-Villar raises a challenge under the equal protection component of the Fifth Amendment's due process clause on the basis of age and gender to two former sections of the Immigration and Nationality Act, 8 U.S.C. §§ 1401(a)(7) and 1409 (1974), which impose a five-year residence requirement, after the age of fourteen, on United States citizen fathers — but not on United States citizen mothers — before they may transmit citizenship to a child born out of wedlock abroad to a non-citizen. This precise question has not been addressed before, but the answer follows from the Supreme Court's opinion in *Nguyen v. INS*, 533 U.S. 53 (2001). There the Court held that § 1409's legitimation requirements for citizen fathers, but not for citizen mothers, did not offend principles of equal protection. Assuming, as the Court did in *Nguyen*, that intermediate scrutiny applies to Flores-Villar's gender-based claim and rational basis review applies to his age-based claim, we conclude that the residence requirements of §§ 1401(a)(7) and 1409 survive. As this is what the district court held in a published opinion, *United States v. Flores-Villar*, 497 F. Supp. 2d 1160 (S.D. Cal. 2007), and we see no other error, we affirm.

I

Flores-Villar was born in Tijuana, Mexico on October 7, 1974 to Ruben Trinidad Floresvillar-Sandez, his United States citizen biological father who was sixteen at the time, and Maria Mercedes Negrete, his non-United States citizen biological mother. Floresvillar-Sandez had been issued a Certificate of Citizenship on May 24, 1999 based on the fact that his mother — Flores Villar's paternal grandmother — is a United States citizen by birth.

His father and grandmother brought Flores-Villar to the United States for medical treatment when he was two months

old. He grew up in San Diego with his grandmother and father. Floresvillar-Sandez is not listed on Flores-Villar's birth certificate, but he acknowledged Flores-Villar as his son by filing an acknowledgment of paternity with the Civil Registry in Mexico on June 2, 1985.

On March 17, 1997 Flores-Villar was convicted of importation of marijuana in violation of 21 U.S.C. §§ 952 and 960; and on June 16, 2003 he was convicted of two counts of illegal entry into the United States in violation of 8 U.S.C. § 1325. He was removed from the United States pursuant to removal orders on numerous occasions: October 16, 1998, April 16, 1999, June 4, 1999, June 4, 2002, October 20, 2003, and March 28, 2005.

He was arrested again on February 24, 2006, and this time was charged with being a deported alien found in the United States after deportation in violation of 8 U.S.C. § 1326(a) and (b). He sought to defend on the footing that he believed he was a United States citizen through his father. Meanwhile, Flores-Villar filed an N-600 application seeking a Certificate of Citizenship, which was denied on the ground that it was physically impossible for his father, who was sixteen when Flores-Villar was born, to have been present in the United States for five years after his fourteenth birthday as required by § 1401(a)(7). The government filed a motion in limine to exclude evidence of derivative citizenship for the same reason, which the district court granted. The court denied Flores-Villar's corresponding motion in limine, to be allowed to present evidence that he believed he was a United States citizen.

The district court found Flores-Villar guilty following a bench trial on stipulated facts.[1] It denied his motion for judgment of acquittal. Flores-Villar timely appeals his conviction.

---

[1]The stipulation provided that Flores-Villar was found in San Diego on February 24, 2006; he admitted that he did not apply for permission to reenter the United States legally after being deported; he crossed the border by walking east of Otay Mesa, California, on October 7, 2005; and no evidence was discovered that he had been granted permission to reenter.

## II

When Flores-Villar was born, § 1401(a)(7) provided, in relevant part:

> (a) The following shall be nationals and citizens of the United States at birth:
>
> . . .
>
> (7) a person born outside the geographic limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years.

8 U.S.C. § 1401(a)(7) (1974). Section 1409 provided:

> (a) The provisions of paragraphs (3) to (5) and (7) of section 1401(a) of this title, and of paragraph (2) of section 1408, of this title shall apply as of the date of birth to a child born out of wedlock . . . if the paternity of such child is established while such child is under the age of twenty-one years by legitimation.
>
> . . .
>
> (c) Notwithstanding the provision of subsection (a) of this section, a person born . . . outside the United States and out of wedlock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United

States or one of its outlying possessions for a continuous period of one year.

8 U.S.C. § 1409(a), (c) (1974).

**[1]** Thus, if a United States citizen father had a child out of wedlock abroad, with a non-United States citizen mother, the father must have resided in the United States for at least five years after his fourteenth birthday to confer citizenship on his child. But a United States citizen mother had to reside in the United States for a continuous period of only one year prior to the child's birth to pass on citizenship. It is this difference that Flores-Villar claims makes an impermissible classification on the basis of gender and age.

**[2]** In *Nguyen*, the United States citizen father of a child born in Vietnam to a Vietnamese mother challenged § 1409's imposition of different rules for obtaining citizenship depending upon whether the one parent with American citizenship is the mother or the father. There, the father complained about the affirmative steps a citizen father, but not a citizen mother, was required by § 1409(a)(4) to take: legitimation; a declaration of paternity under oath by the father; or a court order of paternity. Assuming, without deciding, that the intermediate level of scrutiny normally applied to a gender-based classification applies even when the statute is within Congress' immigration and naturalization power, 533 U.S. at 61, and drawing on Justice Stevens's prior opinion in *Miller v. Albright*, 523 U.S. 420 (1998), the Court identified two important governmental interests substantially furthered by § 1409's distinction between citizen fathers and citizen mothers. The first is "assuring that a biological parent-child relationship exists." *Id*. at 62. Mothers and fathers are not similarly situated in this respect; the relation is verifiable from the birth itself in the case of the mother, while a father's biological relationship to the child is not so easily established. The second interest is ensuring "that the child and the citizen parent have some demonstrated opportunity or potential to

develop not just a relationship that is recognized, as a formal matter, by the law, but one that consists of the real, everyday ties that provide a connection between child and citizen parent and, in turn, the United States." *Id.* at 64-65. The mother knows that the child is in being and has immediate contact at birth such that an opportunity for a meaningful relationship exists, whereas, as the Court put it, "[t]he same opportunity does not result from the event of birth, as a matter of biological inevitability, in the case of the unwed father." *Id.* at 65. Unlike an unwed mother, there is no assurance that the father and his biological child will ever meet, or have the kind of contact from which there is a chance for a meaningful relationship to develop. The Court emphasized that Congress need not ignore these realities for purposes of equal protection, and found that the means chosen — additional requirements for an unwed citizen father to confer citizenship upon his child — are substantially related to the objective of a relationship between parent and child, and in turn, the United States. *Id.* at 66.

[3] Although the means at issue are different in this case — an additional residence requirement for the unwed citizen father — the government's interests are no less important, and the particular means no less substantially related to those objectives, than in *Nguyen*.[2] The government argues that avoiding stateless children is an important objective that is substantially furthered by relaxing the residence requirement for women because many countries confer citizenship based on bloodline (*jus sanguinis*) rather than, as the United States

---

[2]Like the Supreme Court in *Nguyen*, we will assume that intermediate scrutiny applies. The government makes a forceful argument that rational basis review should apply given Congress' broad authority under Article I, Section 8 of the Constitution in matters related to citizenship and immigration. *See Fiallo v. Bell*, 430 U.S. 787, 791-93 (1977). But we do not need to decide which level of review is the most appropriate, and we do not, for the equal protection challenge fails regardless of whether §§ 1401(a)(7) and 1409 are analyzed under intermediate scrutiny, a rational basis standard, or some other level of review in between.

does, on place of birth (*jus soli*). We explained the conundrum in *Runnett v. Shultz*:

> One obvious rational basis for a more lenient policy towards illegitimate children of U.S. citizen mothers is that illegitimate children are more likely to be "stateless" at birth. . . . As the government notes, if the U.S. citizen mother is not a dual national, and the illegitimate child is born in a country that does not recognize citizenship by *jus soli* (citizenship determined by place of birth) alone, the child can acquire no citizenship other than his mother's at birth. This policy clearly demonstrates a "rational basis" for Congress' more lenient policy towards illegitimate children born abroad to U.S. citizen mothers.

901 F.2d 782, 787 (9th Cir. 1990). While Flores-Villar points out that the opposite would be true in Iran, for example, where an illegitimate child born to an Iranian mother and a father who is not an Iranian citizen is regarded as having the father's nationality, this does not diminish the strength of Congress' interest in trying to minimize the risk of statelessness overall. As the Supreme Court remarked in a different context, statelessness is a deplored condition with potentially "disastrous consequences." *Trop v. Dulles*, 356 U.S. 86, 102 (1958). In any event, as *Nguyen* makes clear, we do not expect statutory classifications always to be able to achieve the ultimate objective. 533 U.S. at 70.

Avoiding statelessness, and assuring a link between an unwed citizen father, and this country, to a child born out of wedlock abroad who is to be a citizen, are important interests. The means chosen substantially further the objectives. Though the fit is not perfect, it is sufficiently persuasive in light of the virtually plenary power that Congress has to legislate in the area of immigration and citizenship. *See Nguyen*, 533 U.S. at 70 (noting the difficult context of conferring citizenship, and reiterating that an "exceedingly persuasive justi-

fication" is established "by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' ") (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)); *see also Fiallo*, 430 U.S. at 791-93, 799 n.8 (indicating that congressional power is at its height with respect to immigration and citizenship, and that "legislative distinctions in the immigration area need not be as 'carefully tuned to alternative considerations' as those in the domestic area") (internal citations omitted).

**[4]** Flores-Villar acknowledges that the prevention of stateless children is a legitimate goal, but contends that it cannot be furthered by penalizing fathers. In his view, the real purpose of the statute is to perpetuate the stereotypical notion that women should have custody of illegitimate children. Further, he suggests, the length of residence in the United States says nothing about the father-child relationship or the biological basis of that relationship. And understandably, Flores-Villar emphasizes that his father in fact had a custodial relationship with him. However, the Court rejected similar submissions by the father in *Nguyen*. As it explained:

> This line of argument misconceives the nature of both the governmental interest at issue and the manner in which we examine statutes alleged to violate equal protection. As to the former, Congress would of course be entitled to advance the interest of ensuring an actual, meaningful relationship in every case before citizenship is conferred. Or Congress could excuse compliance with the formal requirements when an actual father-child relationship is proved. It did neither here, perhaps because of the subjectivity, intrusiveness, and difficulties of proof that might attend an inquiry into any particular bond or tie. Instead, Congress enacted an easily administered scheme to promote the different but still substantial

interest of ensuring at least an opportunity for a parent-child relationship to develop. Petitioners' argument confuses the means and ends of the equal protection inquiry; § 1409(a)(4) should not be invalidated because Congress elected to advance an interest that is less demanding to satisfy than some other alternative.

533 U.S. at 69. The residence differential is directly related to statelessness; the one-year period applicable to unwed citizen mothers seeks to insure that the child will have a nationality at birth. Likewise, it furthers the objective of developing a tie between the child, his or her father, and this country. Accordingly, we conclude that even if intermediate scrutiny applies, §§ 1401(a)(7) and 1409 survive.

Sections 1401(a)(7) and 1409 satisfy rational basis review as well. Legislation is presumed valid, and "will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Having passed intermediate scrutiny, the statutory scheme necessarily is rationally related to a legitimate government purpose. This follows from *Runnett*. There we held that it was rational to adopt a more lenient policy for illegitimate children of United States citizen mothers who satisfied a residence requirement than for legitimate children whose mothers failed to meet a higher residency requirement. 901 F.2d at 787.

Flores-Villar contends that there is no rational reason to entrust an eighteen year old male to vote and serve in the military, yet restrict his ability to confer citizenship on his child when a woman, who has greater ability to choose where a child is born, can transmit citizenship to her children without a lengthy residence requirement. However, it is not irrational to believe that residence in the United States advances the objective of a link between the citizen, this country, and a foreign-born child born out of wedlock, and that the children

of citizen mothers born out of wedlock abroad run a greater risk of being stateless than the children of citizen fathers. *Wauchope v. United States Department of State*, 985 F.2d 1407 (9th Cir. 1993), upon which Flores-Villar relies, does not suggest otherwise. There, we found no rational reason for § 1993 of the Revised Statutes of 1874, which accorded to American citizen males, but not American citizen females, the right to pass on citizenship to their foreign-born offspring. *Id.* at 1416. The statutory scheme at issue here is different, and is supported by a different rationale that is in accord with *Miller*, *Nguyen*, and *Runnett*.

**[5]** Rational basis review applies to the claim of age-based discrimination because age is not a suspect class. Flores-Villar's position is that, because it is legally and physically impossible for United States citizen fathers under age nineteen to confer citizenship upon their foreign-born, illegitimate children even if they have resided in the United States for ten years, whereas an unmarried citizen mother need only show one year of residence, the statutory scheme treats men under nineteen differently from similarly situated men over nineteen. He posits that allowing minor women to transmit their citizenship to their foreign born out-of-wedlock children, but not minor men, demonstrates there is no rational basis for such discrimination. Further, in his view, irrationality is shown by the fact that most states set the age of consent to engage in sexual relations, hence conception, at age sixteen. However, it is not irrational to believe that a United States citizen father who has spent at least five years in residence during his teenage years would have more of a connection with this country to pass on than, say, a father who lived in the United States between the ages of one and ten.

III

Flores-Villar also argues that §§ 1401 and 1409 violate substantive due process because these provisions interfere with personal decisions relating to marriage, procreation, fam-

ily relationships, child rearing, and education, as well as with the child's fundamental right to parental involvement. He lacks standing to pursue rights that belong to his father, however, as most of them do. Floresvillar-Sandez is not a party, and the record discloses no obstacle that would prevent him from asserting his own constitutional rights. *See Singleton v. Wulff*, 428 U.S. 106, 113-16 (1976); *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1127 (9th Cir. 2004) (noting the requirement for third-party standing that a hindrance exist to the third party's ability to protect his or her own interests); *see also Barrows v. Jackson*, 346 U.S. 249, 257 (1953) (third-party standing accorded because it "would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court"). The claimed right to parental involvement is personal to Flores-Villar, but he fails precisely to describe a right deeply rooted in the nation's history, as he must do in order to sustain a substantive due process violation. *Washington v. Glucksberg*, 521 U.S. 702, 720 21 (1997). In any event, we have already upheld similar requirements against similar challenges. *See, e.g., Runnett*, 901 F.2d at 787; *Uribe-Temblador v. Rosenberg*, 423 F.2d 717, 718 (9th Cir. 1970).

IV

Given that his paternal grandmother was a United States citizen, Flores-Villar submits that *her* years of residence should be tacked on to his *father*'s for purposes of avoiding constitutional infirmity and meeting the statutory requirement of ten years residence. As we have concluded that § 1401(a)(7) passes constitutional muster, no need appears for the district court (or us) to impute the residency of Flores-Villar's paternal grandmother to avoid unconstitutionality. Regardless, the statute plainly speaks in terms of the residency of the citizen father; it provides no textual basis for imputing residency of a grandparent.

Flores-Villar contends that our decisions in *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013 (9th Cir. 2005), and *Lepe-Guitron*

*v. INS*, 16 F.3d 1021 (9th Cir. 1994), support construing § 1401(a)(7) to impute the residence of a citizen grandparent to a citizen father who has a child out of wedlock while still a minor. *Cuevas-Gaspar* and *Lepe-Guitron* indicate that in some instances involving cancellation or withholding of removal where the statute is silent on imputation, residency of a parent may be imputed to a minor child. But § 1401(a)(7) together with former § 1401(g) are clear that it is the *parent* who must have resided in the United States for the specified period. Section 1401(g) defines a citizen as "a person born outside the geographical limits of the United States . . . of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States" for the prescribed period. Retention of lawful status is, in any event, different from transmission of citizenship. *Cf. Runnett*, 901 F.2d at 784. It is one thing to impute residence when removal is at stake, another to impute it when citizenship is at stake. We decline to import a theory of constructive residence to the clearly articulated, and more demanding, requirements for transmitting citizenship.

V

**[6]** In the wake of *United States v. Smith-Baltiher*, 424 F.3d 913, 925 (9th Cir. 2005), which permitted evidence of a defense of reasonable belief that a defendant charged with attempted illegal entry was a United States citizen, Flores-Villar sought leave to introduce evidence of his belief that he was a United States citizen. He contends that excluding it denied him a meaningful opportunity to present a defense and so violated the Sixth Amendment. We disagree. Attempted illegal entry — at issue in *Smith-Baltiher* — is a specific intent crime, but as *Smith-Baltiher* recognized, illegal reentry and being found in the United States is not. *Id*. at 924. As the crime charged is a general intent crime, Flores-Villar's mistaken belief is not a defense.

**[7]** Neither *Staples v. United States*, 511 U.S. 600, 619 (1994), nor *United States v. Salazar-Gonzalez*, 458 F.3d 851, 855 (9th Cir. 2006), is to the contrary. Both indicate that a general intent mens rea requires a defendant to know the facts that make what he does illegal. This means that the government had to prove beyond a reasonable doubt that Flores-Villar knew he was in the United States, not that the underlying action (entering and remaining in this country) was itself illegal.

## VI

**[8]** Finally, Flores-Villar maintains that his conviction is unsupported by sufficient evidence because the government failed to prove that he lacked the consent of the Attorney General to reapply for admission. Entry without the Attorney General's consent is an element of the crime of illegal reentry under 8 U.S.C. § 1326. *United States v. Blanco-Gallegos*, 188 F.3d 1072, 1074 (9th Cir. 1999). Flores-Villar's premise is that the stipulated facts merely established that he did not apply for permission to reenter the United States, which is the second step of the reentry process and is sought from the Department of State after the Attorney General first gives his permission to apply. *United States v. Cervantes-Flores*, 421 F.3d 825, 834 (9th Cir. 2005). However, Flores-Villar points to nothing in the record indicating that he had sought consent to apply or that it had been granted and an application to reenter was pending. The clear inference from his admission, and the result of the record checks that were undertaken, is that Flores-Villar neither asked for, nor received, the Attorney General's permission to apply for reentry. He unquestionably did not get permission to reenter. In light of all the circumstances, including the fact that he also admitted walking across the border east of Otay Mesa, California, a rational trier of fact could have found beyond a reasonable doubt that the Attorney General did not consent.

**AFFIRMED.**