**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JESUS VALDEZ-NOVOA,
*Defendant-Appellant*.

No. 12-50336

D.C. No.
3:11-cr-00872-JAH-1

OPINION

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted
November 6, 2013—Pasadena, California

Filed July 28, 2014

Before: M. Margaret McKeown, Ronald M. Gould,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge McKeown

# SUMMARY[*]

## Criminal Law

The panel affirmed a conviction for attempting to enter the United States without consent after having been previously removed under 8 U.S.C. § 1326(a).

The defendant collaterally attacked the underlying June 11, 1999, removal order, alleging that the immigration judge erred in concluding that he had been convicted of an aggravated felony (based on his conviction of reckless driving causing great bodily injury) and therefore violated his right to due process by failing to advise him of his apparent eligibility for voluntary departure relief. The panel held that the defendant was not denied due process because the IJ's determination that he had been convicted of an aggravated felony was not contrary to this court's precedent at the time the removal order was issued and was the product of a reasonable reading of 18 U.S.C. § 16. Because the defendant had been convicted of an aggravated felony, the panel concluded that he was statutorily ineligible for voluntary departure, and the IJ was under no obligation to inform him of the existence of such relief for the proceedings to comport with due process.

Alternatively, the panel held that even if the IJ should have informed the defendant of his apparent eligibility for voluntary departure, the defendant was not prejudiced by the error because the defendant has not shown that it is plausible

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that an IJ would have granted a request for voluntary departure in light of his negative and positive equities at the time of the removal proceedings.  Because the defendant was not prejudiced by the presumed error, the panel concluded that the removal order was not fundamentally unfair under 8 U.S.C. § 1326(d)(3).

The panel held that the conviction based on the defendant's videotaped confession does not run afoul of the *corpus delicti* doctrine because ample record evidence corroborates the defendant's confession to the gravamen of the offense and establishes the trustworthiness of his statement to a DHS officer.

Dissenting, Judge McKeown wrote separately because the government earlier conceded that there was a due process violation, and because the majority elevates the benchmark for prejudice, the "plausibility" inquiry, to the higher standard of either preponderance or probability.  She would reverse the district court's judgment because it is plausible that the IJ would have exercised discretion to grant voluntary departure.

**COUNSEL**

Kristi A. Hughes (argued) and Lauren D. Cusick, Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant.

Daniel E. Zipp (argued), Assistant United States Attorney; Laura E. Duffy, United States Attorney; Bruce R. Castetter, Assistant United States Attorney, Chief, Appellate Section, Criminal Division, San Diego, California, for Plaintiff-Appellee.

**OPINION**

BYBEE, Circuit Judge:

Jesus Valdez-Novoa, a native and citizen of Mexico, appeals his conviction for attempting to enter the United States without consent after having been previously removed in violation of 8 U.S.C. § 1326(a). We have jurisdiction under 28 U.S.C. § 1291. We affirm.

Valdez-Novoa entered the U.S. without inspection in 1983 and has never obtained legal status. On June 11, 1999, an Immigration Judge (IJ) deemed Valdez-Novoa removable and prohibited him from reentering the U.S. at any time because he had been convicted of an aggravated felony. Throughout the next decade, Valdez-Novoa returned to the U.S. on several occasions and each time he was subsequently removed pursuant to the IJ's 1999 order. On February 16, 2011, Valdez-Novoa attempted to reenter the U.S. on foot at the San Ysidro Port of Entry. At trial, the government introduced a videotaped conversation between Valdez-Novoa

and a Department of Homeland Security (DHS) officer in which Valdez-Novoa explained that he was attempting to cross the border using an identification document bearing another person's name that he had purchased in Mexico. He also confessed that he had been previously removed several times and that he had not requested permission to return to the U.S. Valdez-Novoa was convicted and sentenced to seventy months' imprisonment.

Valdez-Novoa raises two issues on appeal. First, he collaterally attacks the underlying June 11, 1999, removal order under 8 U.S.C. § 1326(d). He alleges that the IJ erred in concluding that he had been convicted of an aggravated felony and therefore violated his right to due process by failing to advise him of his apparent eligibility for voluntary departure relief. We hold that Valdez-Novoa was not denied due process because the IJ's determination that he had been convicted of an aggravated felony was not contrary to our precedent at the time the removal order was issued and was the product of a reasonable reading of the statute. Because Valdez-Novoa had been convicted of an aggravated felony, he was statutorily ineligible for voluntary departure, and the IJ was under no obligation to inform him of the existence of such relief for the proceedings to comport with due process. Alternatively, we hold that even if the IJ should have informed Valdez-Novoa of his apparent eligibility for voluntary departure, the failure to do so did not render the removal proceedings "fundamentally unfair" under § 1326(d)(3) because Valdez-Novoa was not prejudiced by the alleged error. We therefore conclude that the June 11, 1999, removal order is a valid predicate to a conviction for attempted illegal reentry in violation of § 1326(a).

Second, Valdez-Novoa contends that the government failed to introduce sufficient independent evidence to satisfy the *corpus delicti* rule. We hold that ample record evidence corroborates Valdez-Novoa's confession to the gravamen of the offense and establishes the trustworthiness of his statement to the DHS officer. For these reasons, the conviction based on Valdez-Novoa's videotaped confession does not run afoul of the *corpus delicti* doctrine.

I

A. *Valdez-Novoa's Immigration and Criminal History*

Valdez-Novoa arrived in the U.S. without inspection in 1983 when he was nine years old. He lived with his parents and eight siblings in California. Although Valdez-Novoa's parents and siblings eventually obtained legal status, he remained in the U.S. without documentation.

Over the next two decades, Valdez-Novoa accumulated a substantial criminal record. In 1992, he was convicted of misdemeanor driving under the influence and sentenced to probation. Two years later, he was convicted of misdemeanor disobeying a court order and sentenced to six days in jail and probation. Later that same year, Valdez-Novoa was again convicted of misdemeanor driving under the influence as well as misdemeanor driving with a suspended license and sentenced to twelve days in jail and probation. In 1996, he was convicted of felony assault likely to cause great bodily injury. According to the probation officer's report, Valdez-Novoa grabbed his ex-girlfriend by the hair and threw her onto the hood of his car. Valdez-Novoa then fought his ex-girlfriend's companion when he intervened. He was sentenced to 180 days in jail and three years' probation. His

parole was twice revoked, and he served additional time in custody.

After his conviction for felony assault likely to cause great bodily injury, the Immigration and Naturalization Service (INS) served Valdez-Novoa with a notice to appear. The agency released him on bond pending his removal proceedings.  In 1998, while awaiting his removal proceedings, Valdez-Novoa was convicted of felony reckless driving causing great bodily injury and misdemeanor driving with a suspended license.  According to the police investigation report, Valdez-Novoa followed a car carrying two men whom he had been harassing, caused a collision by cutting in front of them, and then rammed their car until it flipped off the road.  One of the victims experienced significant bleeding while Valdez-Novoa fled the scene.  He was sentenced to two years' imprisonment.

Upon Valdez-Novoa's release from California state prison on June 11, 1999, an IJ deemed him removable and prohibited him from reentering the U.S. at any time because he had been convicted of an aggravated felony.  The INS removed Valdez-Novoa to Mexico four days later, but Valdez-Novoa quickly returned to the U.S.  A police officer who recognized Valdez-Novoa detained him, and, on January, 18, 2000, he was again removed to Mexico pursuant to the June 11, 1999 removal order.  At some point within the next few months, Valdez-Novoa crossed the border again. On October 1, 2000, he was convicted of misdemeanor driving under the influence and sentenced to 150 days in jail and probation.

Upon being released from jail, Valdez-Novoa was removed to Mexico for the third time on May 16, 2001.  Two

years later, he was again arrested for misdemeanor driving under the influence and sentenced to eleven days in jail and probation. On October 3, 2003, Valdez-Novoa was removed to Mexico for the fourth time. He returned to the U.S., and seven days later, he was removed again.

In 2004, Valdez-Novoa was convicted of misdemeanor driving under the influence and sentenced to twenty days in jail and probation. In 2005, he was again convicted of misdemeanor driving under the influence and sentenced to fourteen days in jail and probation. And, in 2006, he was convicted of felony driving under the influence and misdemeanor driving with a suspended license and sentenced to thirty months' imprisonment.

On June 2, 2008, after he was released from California state prison, Valdez-Novoa was removed to Mexico. Once more he returned to the U.S., and, nine days later, he was removed for the seventh time. Valdez-Novoa soon reentered the U.S. again. In November 2008, he was convicted of felony transportation or sale of methamphetamine and sentenced to four years in federal prison. On January 18, 2011, Valdez-Novoa was released from prison and removed to Mexico pursuant to the original June 11, 1999, removal order.

B.  *The Attempted Illegal Reentry at Issue in This Case*

On February 16, 2011, Valdez-Novoa once more attempted to return to the U.S. This time he was detained by Customs and Border Protection officials at the San Ysidro Port of Entry and indicted for attempted illegal reentry in violation of 8 U.S.C. § 1326(a). At trial, DHS Customs and Border Protection Officer Edgar Pascua testified that he was

working in the secondary screening area at the San Ysidro Port of Entry on February 16, 2011. Pascua explained that he prepared a report stating that on that date he fingerprinted a man who matched Valdez-Novoa's profile in the Integrated Automated Fingerprinting Identification System.

Next, DHS Criminal Enforcement Officer Sue Curtis testified that she placed Valdez-Novoa under arrest and advised him of his *Miranda* rights. The government introduced a videotaped recording of Curtis's interview with Valdez-Novoa. During the interview, Valdez-Novoa stated that he had presented an identification document bearing the name Omar Parra-Sanchez. He explained that he had purchased the document from a woman in Tijuana, Mexico. Valdez-Novoa acknowledged that he understood that it is illegal to present another person's identification in order to gain entry into the U.S. He further admitted that he had been removed to Mexico about a month earlier and on other occasions dating back to 1999 and that he had not requested permission to reenter the U.S.

After the jury returned a guilty verdict, the district court entered judgment and sentenced Valdez-Novoa to seventy months' imprisonment. Valdez-Novoa timely appealed.

II

Valdez-Novoa's first argument on appeal is that the district court erred in denying his motion to dismiss the indictment on the basis that the June 11, 1999, removal order was invalid under 8 U.S.C. § 1326(d). We "review[] *de novo* the denial of a motion to dismiss an 8 U.S.C. § 1326 indictment when the motion to dismiss is based on alleged due process defects in an underlying deportation proceeding."

*United States v. Muro-Inclan*, 249 F.3d 1180, 1182 (9th Cir. 2001).

A. *Statutory Framework*

A jury convicted Valdez-Novoa of violating 8 U.S.C. § 1326(a), which imposes criminal sanctions on "any alien who—(1) has been denied admission, excluded, deported, or removed . . . and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless . . . the Attorney General has expressly consented." In § 1326(d), the statute offers a limited avenue by which the defendant can collaterally attack the underlying removal order that serves as a predicate to his conviction for violating § 1326(a). Section 1326(d) provides in relevant part that

> an alien may not challenge the validity of the deportation order described in [§ 1326(a)(1)] . . . unless the alien demonstrates that—(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair.

Valdez-Novoa contends that the June 11, 1999, removal order is invalid because the IJ did not inform Valdez-Novoa that he might be eligible for voluntary departure relief. An IJ is obligated to inform an alien of his "apparent eligibility" for forms of relief such as voluntary departure. *See* 8 C.F.R. § 1240.11(a)(2); *see also United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000) ("[W]here the record contains an

inference that the petitioner is eligible for relief from deportation, the IJ must advise the alien of this possibility and give him the opportunity to develop the issue." (internal quotation marks and citation omitted)).  An IJ's failure to inform an alien of his apparent eligibility for voluntary departure can serve as the basis for a collateral attack on the underlying removal order under § 1326(d).  *See, e.g.*, *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1262 (9th Cir. 2013).

To challenge the validity of a removal order under § 1326(d), the defendant must first demonstrate that he "exhausted any administrative remedies that may have been available to seek relief against the order."  8 U.S.C. § 1326(d)(1).  Where, as here, the defendant argues that "the IJ has failed to provide information about apparent eligibility for relief, we excuse the alien from demonstrating that the alien exhausted any administrative remedies that may have been available." *United States v. Vidal-Mendoza*, 705 F.3d 1012, 1015 (9th Cir. 2013) (internal quotation marks and citation omitted).  Second, the defendant must demonstrate that "the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review." 8 U.S.C. § 1326(d)(2).  Valdez-Novoa need not make any further showing to satisfy this prong because "the [ ] failure to inform an alien regarding 'apparent eligibility' for relief [ ] deprive[s] the alien of the opportunity for judicial review." *Rojas-Pedroza*, 716 F.3d at 1262 (third alteration in original) (internal quotation marks and citation omitted).  Third, the defendant must demonstrate that "the entry of the [removal] order was fundamentally unfair." 8 U.S.C. § 1326(d)(3).  We have held that "[a]n underlying removal order is fundamentally unfair if: (1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a

result of the defects." *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1048 (9th Cir. 2004) (internal quotation marks and citation omitted). Our resolution of Valdez-Novoa's collateral attack on his removal proceedings therefore turns on whether the IJ's failure to advise him of his apparent eligibility for voluntary departure relief was (1) a due process violation that was (2) prejudicial.

## B. *Due Process Violation*

As noted, an IJ is obligated to inform an alien of his apparent eligibility for forms of relief such as voluntary departure. *See* 8 C.F.R. § 1240.11(a)(2); *see also Arrieta*, 224 F.3d at 1079. But an alien is not eligible for voluntary departure if he has been convicted of an aggravated felony. *See* 8 U.S.C. § 1229c(a)(1); 8 U.S.C. § 1227(a)(2)(A)(iii). Valdez-Novoa contends that the IJ erred in concluding that he had been convicted of an aggravated felony and thus erred in failing to advise him of his apparent eligibility for voluntary departure. The government disagrees, and it argues that Valdez-Novoa was statutorily ineligible for voluntary departure because the IJ correctly determined that he had been convicted of an aggravated felony.[1]

---

[1] The government did not raise this argument before the district court, where it expressly conceded that the IJ's failure to advise Valdez-Novoa of his eligibility for voluntary departure relief was a due process violation "in light of later-developing case law." "Issues not presented to the district court cannot generally be raised for the first time on appeal." *United States v. Robertson*, 52 F.3d 789, 791 (9th Cir. 1994). We may, however, consider an issue raised for the first time on appeal if "the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." *United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990). This is a pure question of law, and Valdez-Novoa was not negatively affected by

the government's decision not to raise it before the district court. Because the district court concluded that Valdez-Novoa was not prejudiced by any alleged due process violation that occurred during his removal proceedings, the parties would be in the same position before us if the government had raised the point regardless of how the district court resolved it.

The fact that the government conceded before the district court that Valdez-Novoa experienced a due process violation does not preclude us from resolving its argument on appeal. "'We may consider an issue *conceded or neglected below* if the issue is purely one of law and the pertinent record has been fully developed.'" *White v. McGinnis*, 903 F.2d 699, 700 n.4 (9th Cir. 1990) (en banc) (emphasis added) (quoting *United States v. Gabriel*, 625 F.3d 830, 832 (9th Cir. 1980)); *see also Phillips v. Ornoski*, 673 F.3d 1168, 1190 n.17 (9th Cir. 2012). "It is immaterial whether the issue was not tried in the district court because it was not raised or because it was raised but conceded by the party seeking to revive it on appeal." *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978); *see also Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1110 (9th Cir. 2010).

"Even when a case falls into one of the exceptions to the rule against considering new arguments on appeal, we must still decide whether the particular circumstances of the case overcome our presumption against hearing new arguments." *Dream Palace v. Cnty. of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2003). Our general presumption against considering new arguments on appeal operates to "ensure that legal arguments are considered with the benefit of a fully developed factual record, offers appellate courts the benefit of the district court's prior analysis, and prevents parties from sandbagging their opponents with new arguments on appeal." *Id.* Here, the issue before us does not require additional factual development, and the district court's decision would not have been dispositive in light of its conclusion that Valdez-Novoa was not prejudiced by the IJ's failure to advise him of his apparent eligibility for voluntary departure. Furthermore, Valdez-Novoa had ample opportunity to argue that the IJ violated his right to due process before the government conceded this point in the proceedings below and again in its reply brief on appeal. We will exercise our discretion to reach the issue in order to offer clarity to district courts, immigration judges, and aliens in future

An aggravated felony is "a crime of violence . . . for which the term of imprisonment [is] at least one year." 8 U.S.C. § 1101(a)(43)(F).**[2]** In 1999, when the IJ issued the removal order, we had yet to decide whether an offense involving reckless conduct—such as felony reckless driving causing great bodily injury—was a crime of violence. We subsequently held that convictions under similar statutes punishing the reckless use of force were crimes of violence. *See United States v. Ceron-Sanchez*, 222 F.3d 1169, 1171–72 (9th Cir. 2000), *overruled by Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1129 (9th Cir. 2006) (en banc); *United States v. Grajeda-Ramirez*, 348 F.3d 1123, 1124–25 (9th Cir. 2003), *overruled by Fernandez-Ruiz*, 466 F.3d at 1129. But, in 2006, we reversed course and held that offenses involving the reckless use of force are *not* crimes of violence. *See Fernandez-Ruiz*, 466 F.3d at 1129. If Valdez-Novoa's removal order had been issued after *Ceron-Sanchez* was decided in 2001 and before *Fernandez-Ruiz* was decided in 2006, then we would unquestionably follow *Ceron-Sanchez* and *Grajeda-Ramirez* in applying § 1326(d) even though we subsequently overruled these cases. *See United States v. Lopez-Velasquez*, 629 F.3d 894, 895, 901 (9th Cir. 2010) (en

---

proceedings that present the same question. *See, e.g.*, *Emmert Indus. Corp. v. Artisan Assocs., Inc.*, 497 F.3d 982, 986 (9th Cir. 2007).

**[2]** As the government acknowledges, Valdez-Novoa's 1996 conviction for felony assault likely to cause great bodily injury is not an aggravated felony because the term of imprisonment was not at least one year. He was initially sentenced to 180 days' imprisonment and eventually served 363 days after his probation was twice revoked. For this reason, the only conviction that might qualify as an aggravated felony is his 1997 conviction for felony reckless driving causing great bodily injury.

banc); *Vidal-Mendoza*, 705 F.3d at 1017 ("[A]n IJ must provide accurate information regarding an alien's eligibility for relief 'under the applicable law at the time of his deportation hearing,' . . . [but] by the same token, an IJ need not anticipate future 'change[s] in law' when determining an alien's 'apparent eligibility' for relief from removal." (quoting *Lopez-Velasquez*, 705 F.3d at 897, 901) (second alteration in original)). In other words, our decision in *Fernandez-Ruiz* does not apply retroactively to cases on collateral review.

Valdez-Novoa correctly points out that we must evaluate this question under the law as it existed in 1999 rather than as it stands today or at any other point in time. In short, the subsequent fluctuations in our case law concerning whether offenses that punish reckless conduct are crimes of violence cannot decide this case. For this reason, Valdez-Novoa argues that reckless driving causing great bodily injury is not a crime of violence under the plain meaning of the phrase as it is defined in 18 U.S.C. § 16.[3] But it is not a due process violation for an IJ to conclude, based solely on the text of 18 U.S.C. § 16, that reckless driving causing great bodily injury is a crime of violence. In the absence of contrary precedent from our court or the Supreme Court, we will not disrupt an IJ's reasonable reading of an ambiguous provision when the decision is collaterally attacked under § 1326(d).

---

[3] "The term 'crime of violence' means—(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16. The definition of "crime of violence" is adopted in the Immigration and Nationality Act's definition of "aggravated felony" in 8 U.S.C. § 1101(a)(43)(F).

The IJ's decision was plainly reasonable given that we reached the same conclusion when interpreting similar offenses involving reckless conduct in *Ceron-Sanchez* and *Grajeda-Ramirez*, which were decided soon after the IJ concluded that Valdez-Novoa was convicted of a crime of violence. The IJ encountered a difficult question that had yet to be resolved by our court and offered a reasonable resolution that was consistent with the one we arrived at when we first confronted the issue.

In *Vidal-Mendoza*, we rejected an argument similar to the one raised by Valdez-Novoa in part because it "would effectively transform a § 1326(d) collateral challenge into a direct appeal." *Vidal-Mendoza*, 705 F.3d at 1019. Valdez-Novoa could have appealed to the Board of Immigration Appeals (BIA) and then filed a petition for review with this court if he wished to advance his argument that the IJ erred in determining that he had been convicted of a crime of violence. *Cf. Alvarenga-Villalobos v. Ashcroft*, 271 F.3d 1169, 1173 (9th Cir. 2001) (rejecting the argument, in the context of deciding a petition for habeas corpus, that an alien who had unlawfully reentered the U.S. in violation of § 1326 "did not have meaningful judicial review available to him at the time of the IJ's original ruling because the law at the time was unfavorable to him" by reasoning that the alien "had the right to appeal his removal order to the BIA and, if unsuccessful there, to this court"). Valdez-Novoa could have later attempted to take advantage of our favorable decision in *Fernandez-Ruiz*. *Cf. Lopez-Velasquez*, 629 F.3d at 899–900 ("[W]hen intervening law renders an alien eligible for discretionary relief for which he was ineligible at the time of his deportation hearing, the proper remedy is for the [alien] . . . to file a motion to reopen." (quotation marks and citation omitted) (second alteration and omission in original)).

Instead of pursuing the available administrative and judicial remedies, Valdez-Novoa waited until he was charged with violating § 1326(a) before deciding to collaterally attack the IJ's determination by asking us to stand in the shoes of an IJ in 1999. Valdez-Novoa advocates for an approach that would, in effect, deem any decision by an IJ susceptible to collateral attack unless there is circuit precedent squarely on point at the time the decision is rendered. We decline to convert § 1326(d) into a mechanism for invalidating removal orders that are not contrary to circuit precedent and are based on a reasonable reading of the statute at issue.

We hold that Valdez-Novoa was not deprived of his due process rights when the IJ determined that he had been convicted of an aggravated felony and accordingly concluded that he was ineligible for voluntary departure relief. Although this decision is sufficient to dispose of Valdez-Novoa's collateral attack on his removal order, we next conclude that, in the alternative, Valdez-Novoa was not prejudiced by any alleged due process violation.

C. *Prejudice*

In order to demonstrate that "the entry of the [removal] order was fundamentally unfair," 8 U.S.C. § 1326(d)(3), the defendant must also show that "he suffered prejudice as a result of the defects" in the removal proceedings. *Ubaldo-Figueroa*, 364 F.3d at 1048; s*ee also Rojas-Pedroza*, 716 F.3d at 1263 ("Where an IJ failed to advise an alien of his or her apparent eligibility for relief, the alien must still establish prejudice under the second prong of § 1326(d)(3)." (internal quotation marks and citations omitted)). Even assuming *arguendo* that Valdez-Novoa's removal proceedings did not comport with due process because the IJ

did not advise him of his apparent eligibility for voluntary departure relief, we hold that Valdez-Novoa was not prejudiced by the error.

1.  Defining "prejudice" under § 1326(d)(3)

The IJ's failure to advise Valdez-Novoa of his apparent eligibility for voluntary departure prejudiced him only if it is "plausible" that the IJ would have granted voluntary departure relief. *See United States v. Cisneros-Resendiz*, 656 F.3d 1015, 1018 (9th Cir. 2011) ("If the alien alleges that the IJ's failure to provide information about a form of potentially available discretionary relief caused a due process violation, the alien must show prejudice by establishing that it was plausible that the IJ would have granted such relief."). At oral argument, Valdez-Novoa's counsel posited that discretionary relief is "plausible" when "it would not have been an abuse of discretion for the IJ to grant relief." Valdez-Novoa's proposed definition of "plausibility" is contrary to our case law. We have held that "establishing 'plausibility' requires more than establishing a mere 'possibility.'" *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1089 (9th Cir. 2011); *see also Cisneros-Resendiz*, 656 F.3d at 1018 (requiring the alien to demonstrate that "it was plausible (not merely conceivable) that the IJ would have exercised his discretion in the alien's favor" (citation omitted)). We reaffirm once more that a defendant is prejudiced under § 1326(d)(3) when he shows that it is plausible, rather than merely conceivable or possible, that an IJ would have granted the relief for which he was apparently eligible. We expressly reject the contention that relief is "plausible" whenever an IJ could have granted the relief at issue without abusing his discretion. Such a standard is akin to a showing of mere possibility or conceivability, which we have plainly held is

insufficient to satisfy the prejudice prong of § 1326(d)(3). *See Barajas-Alvarado*, 655 F.3d at 1089; *Cisneros-Resendiz*, 656 F.3d at 1018.

Although the test proffered by Valdez-Novoa lacks support in our case law, we wish to clarify a different ambiguity concerning how we have allocated the burden to show that it is plausible that the IJ would have granted discretionary relief. Most of our cases state simply that the defendant bears the burden of demonstrating that he was prejudiced by the due process violation. *See United States v. Gomez*, No. 11-30262, 2014 WL 1623725, at *9 (9th Cir. Apr. 24, 2014) ("[I]n a collateral attack on the validity of a deportation order the defendant bears the burden of proving prejudice under § 1326(d)(3). To establish prejudice in this context, the defendant must show that it was 'plausible' that he would have received some form of relief from removal had his rights not been violated in the removal proceedings." (citation omitted)); *Rojas-Pedroza*, 716 F.3d at 1263; *Vidal-Mendoza*, 705 F.3d at 1016; *United States v. Valdavinos-Torres*, 704 F.3d 679, 690 (9th Cir. 2012); *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1049 (9th Cir. 2012); *United States v. Melendez-Castro*, 671 F.3d 950, 954 (9th Cir. 2012); *Cisneros-Resendiz*, 656 F.3d at 1018; *Bajaras-Alvarado*, 655 F.3d at 1089; *United States v. Arias-Ordonez*, 597 F.3d 972, 978 (9th Cir. 2010); *United States v. Moriel-Luna*, 585 F.3d 1191, 1196 (9th Cir. 2009); *United States v. Calderon-Segura*, 512 F.3d 1104, 1108 (9th Cir. 2008); *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1077 (9th Cir. 2005); *United States v. Pallares-Galan*, 359 F.3d 1088, 1103 (9th Cir. 2004); *Ubaldo-Figueroa*, 364 F.3d at 1048; *United States v. Ahumada-Aguilar*, 295 F.3d 943, 947 (9th Cir. 2002); *Muro-Inclan*, 249 F.3d at 1185; *United States v. Garcia-Martinez*, 228 F.3d 956, 963 (9th Cir. 2000); *Arrieta*,

224 F.3d at 1079; *United States v. Esparza-Ponce*, 193 F.3d 1133, 1136 (9th Cir. 1999); *United States v. Acre-Hernandez*, 163 F.3d 559, 563 (9th Cir. 1999); *United States v. Jimenez-Marmolejo*, 104 F.3d 1083, 1086 (9th Cir. 1996); *United States v. Leon-Leon*, 35 F.3d 1428, 1432 (9th Cir. 1994).

But in a few of our older cases, we articulated a burden shifting scheme, whereby the burden shifts to the government to prove that the defendant would not have received discretionary relief if the defendant makes a "prima facie showing of prejudice." *See United States v. Gonzalez-Valerio*, 342 F.3d 1051, 1054 (9th Cir. 2003) ("In order [to] successfully to challenge his deportation order, [the defendant] must establish that he was prejudiced by the failure of the IJ to inform him of the potential for discretionary relief. . . . Once [the defendant] makes a prima facie showing of prejudice, the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome."); *United States v. Lopez-Vasquez*, 1 F.3d 751, 756 n.9 (9th Cir. 1993); *United States v. Gonzalez-Mendoza*, 985 F.2d 1014, 1017 (9th Cir. 1993); *United States v. Cerda-Pena*, 799 F.2d 1374, 1379 (9th Cir. 1986).

We detect no meaningful distinction between our cases that use the language of "prima facie showing" and "burden shifting" and those that do not. In other words, there is no difference between saying that the defendant must "make[] a prima facie showing of prejudice," *Gonzalez-Valerio*, 342 F.3d at 1054, and saying that "the defendant must show that it was 'plausible' that he would have received some form of relief from removal," *Gomez*, 2014 WL 1623725, at \*9. We do not read any of our cases to suggest that requiring the defendant to make "a prima facie showing" is either more or

less onerous than requiring the defendant to show that relief was "plausible." Rather, the word "plausibility" describes the substantive content of the requisite "prima facie showing." To say that a defendant must "make[] a prima facie showing of prejudice," *Gonzalez-Valerio*, 342 F.3d at 1054, begs the question: What must the defendant show in order to satisfy this requirement? The answer is that in order to "make a prima facie showing of prejudice," *id.*, the defendant must "show that it was 'plausible' that he would have received some form of relief from removal," *Gomez*, 2014 WL 1623725, at \*9.**[4]**

---

**[4]** To illustrate this point, consider two well-developed areas of the law where one party is required to make a "prima facie showing" in order to shift the burden to his opponent: the limits on the use of peremptory challenges imposed by *Batson v. Kentucky*, 476 U.S. 79 (1986), and the framework for evaluating disparate-treatment claims developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In the former context, we have reasoned that "under *Batson*, [the defendant] has made a *prima facie showing*" where he "has shown a pattern of strikes that raises a *plausible* inference of discrimination." *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004) (emphasis added). In the latter context, the Supreme Court has held that its requirement that a complaint include "enough facts to state a claim to relief that is *plausible* on its face" is not contrary to its holding that "'a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a *prima facie case* of discrimination under the framework set forth in [*McDonnell Douglas*].'" *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 569–70 (2007) (emphasis added) (first alteration in original) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)). In both contexts, demonstrating that relief is "plausible" is part of the requisite "prima facie showing." Put differently, there is nothing inconsistent about saying that the defendant must make a "prima facie showing" in one case and saying that the defendant must show that relief is "plausible" in another case.

It follows that there is no difference between describing the prejudice analysis as a two-part burden shifting inquiry, on the one hand, and stating that it is the defendant's burden to show prejudice, on the other hand. *Compare Gonzalez-Valerio*, 342 F.3d at 1054 ("Once [the defendant] makes a prima facie showing of prejudice, the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome.") *with Gomez*, 2014 WL 1623725, at *9 ("[I]n a collateral attack on the validity of a deportation order the defendant bears the burden of proving prejudice under § 1326(d)(3)."). The crucial point is that all of our cases hold that the defendant must make the initial showing that he was prejudiced by the alleged due process violation. Every case involving the prejudice prong of § 1326(d)(3) proceeds in much the same way: the defendant cites cases from the courts and the BIA where an alien with similar equities was granted the discretionary relief at issue, and the government distinguishes those cases, cites cases to the contrary, or argues that the cases relied on by the defendant are outliers. We have always (1) placed the burden on the defendant to show that he was prejudiced by the due process violation, (2) evaluated the authorities cited by the defendant, (3) compared them to the authorities offered by the government, and (4) determined whether the defendant has carried his burden to prove that he suffered prejudice.

All of our recent cases have discarded the burden-shifting language in favor of the more straightforward statement that the defendant bears the burden of proving prejudice under § 1326(d)(3). *See, e.g.*, *Rojas-Pedroza*, 716 F.3d at 1263 (citing *Gonzalez-Valerio*, 342 F.3d at 1054, for the proposition that § 1326(d)(3) "requires the alien to make an additional showing and demonstrate 'plausible grounds' for

relief"). We reaffirm that the burden to show prejudice rests with the defendant. We now apply this well-established approach to the facts of this case and conclude that the IJ's failure to notify Valdez-Novoa of his apparent eligibility for voluntary departure did not prejudice him because Valdez-Novoa has not shown that it is plausible that he would have received such relief.

2.  Application of the § 1326(d)(3) prejudice prong

We follow a two-step process to determine whether the defendant was prejudiced by the IJ's decision not to inform him of his apparent eligibility for voluntary departure relief.

> First, we identify the factors relevant to the IJ's exercise of the discretion for the relief being sought. Next, we determine whether, "in light of the factors relevant to the form of relief being sought, and based on the unique circumstances of the alien's own case, it was plausible (not merely conceivable) that the IJ would have exercised his discretion in the alien's favor."

*Rojas-Pedroza*, 716 F.3d at 1263 (quoting *Barajas-Alvarado*, 655 F.3d at 1089).

The factors relevant to an IJ deciding whether to grant voluntary departure are the alien's negative and positive equities. *See Matter of Gamboa*, 14 I. & N. Dec. 244, 248 (BIA 1972); *see also Rojas-Pedroza*, 716 F.3d at 1264–65. The negative equities include "the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness,

and recency of any criminal record; and other evidence of bad character or the undesirability of the applicant as a permanent resident." *Matter of Arguelles-Campos*, 22 I. & N. Dec. 811, 817 (BIA 1999). The positive equities "are compensating elements such as long residence here, close family ties in the United States, or humanitarian needs." *Id.*

Turning to the facts of this case, we first note that Valdez-Novoa's criminal record was recent and serious when he was deemed removable in 1999. He had been convicted of two felonies involving injury to others: assault likely to cause great bodily injury and reckless driving causing great bodily injury. Taken together, he was incarcerated for almost three years as a consequence of these convictions. He had also been convicted of three misdemeanors, including two DUIs. Valdez-Novoa's criminal record reveals that he engaged in a pattern of increasingly dangerous and violent conduct over the years leading up to his removal proceedings in 1999. His inability to abide by the law also affected the functioning of the immigration system. The INS served Valdez-Novoa with a notice to appear after he was convicted of felony assault likely to cause great bodily injury in 1996. The agency permitted him to post bond rather than remain in detention while his removal proceedings were pending even though he resided in the U.S. without documentation and had already been convicted of three misdemeanors and one felony. But Valdez-Novoa could not attend his scheduled hearing before the IJ because he wound up back in jail. He was eventually convicted of felony reckless driving causing great bodily injury and served part of his two-year prison sentence before the IJ was able to conclude his removal proceedings.

On the other side of the ledger, Valdez-Novoa could have presented meaningful positive equities. He arrived in the

U.S. as a child, and by 1999 his parents had obtained status as lawful permanent residents. He had eight younger siblings who also lived in California, some or all of whom were either citizens or lawful permanent residents at the time he was deemed removable. When he was not incarcerated, Valdez-Novoa earned a diploma from an alternative high school and a welding certificate from a college and worked various jobs.

Valdez-Novoa cites a number of BIA decisions in support of his position that it is plausible that an IJ would have granted voluntary departure to an alien with his mix of negative and positive equities. His best case is probably *In re Gonzales-Figeroa*, 2006 WL 729784 (BIA Feb. 10, 2006). There, the Board concluded that the IJ did not abuse his discretion in deciding to grant voluntary departure to an alien who had four convictions for assault—one of which had led to a six-month prison term—along with a conviction for resisting arrest. *Id.* at *1. Gonzales-Figeroa presented compelling positive equities that counterbalanced his criminal record. He had resided in the U.S. for fifteen years at the time of his removal proceedings, his mother was a lawful permanent resident who relied on him for financial support, his sister and nieces were citizens, his mother had already filed a visa petition on his behalf, and he had joined Alcoholics Anonymous while in prison and stopped drinking. *Id.* On balance, Valdez-Novoa's criminal history was arguably more serious given the risk of severe injury or death posed by his two felony offenses, the length of his prison terms, and the absence of record evidence that he was reforming the behaviors that contributed to his recidivism. Both Gonzales-Figeroa and Valdez-Novoa offered similarly meaningful positive equities, namely lengthy residence in the U.S. and close ties to family members residing lawfully in the U.S.

Valdez-Novoa also relies on *In re Sanabria-Dominguez*, 2010 WL 2601495 (BIA May 25, 2010). There, the Board, applying *de novo* review, reversed the IJ's determination that the alien was not entitled to voluntary departure. *Id.* at *1. Sanabria-Dominguez's negative equities included "his history of repeated illegal entries to the United States with the assistance of smugglers, record of previous voluntary returns, failure to file tax returns, and driving without a license." *Id.* And his positive equities included "his residence in the United States, the assistance that he has provided his United States citizen wife with regard to her addiction and medical condition, his United States citizen son, and his contributions to his community, including his work as a drug counselor and the assistance he has provided his church." *Id.* Unlike Valdez-Novoa, Sanabria-Dominguez had no convictions for violent conduct, let alone multiple felony convictions for inflicting injury on others and multiple convictions for placing the lives of others at risk by driving under the influence. Sanabria-Dominguez's positive equities were arguably more compelling as well, since he not only had ties to family members residing lawfully in the U.S., but was responsible for supporting his wife and child, both of whom were U.S. citizens.

The other cases referenced by Valdez-Novoa are farther afield. In *Matter of Magana*, 17 I. & N. Dec. 111 (BIA 1979), the Board held that the alien was entitled to voluntary departure even though he was married to a woman in Mexico when he married another woman in the U.S. and then applied for a visa. *Id.* at 112, 115. But there is no indication that Magana was saddled with other negative equities such as a lengthy criminal history involving violent conduct. And in *Matter of Battista*, 19 I. & N. Dec. 484 (BIA 1987), the Board did not disturb the IJ's decision to grant voluntary departure

to an alien who had been convicted of breaking and entering, grand theft, and possession of criminal tools. *Id.* at 484–85. Battista's negative equities are less impactful because his convictions arose from a single incident rather than a pattern of ongoing and increasingly serious misconduct and they did not involve violence toward others. And Battista, like Valdez-Novoa, presented compelling positive equities because he was married to a U.S. citizen who was pregnant with his child. *Id.* Although Valdez-Novoa does not cite the case, we note that he might draw some support from *In re Moreno Bacahui*, 2010 WL 5635608 (BIA Dec. 30, 2010). There, the BIA, applying de novo review, reversed the IJ's decision to deny the alien's request for voluntary departure. *Id.* at *1. An INS report stated that Moreno Bacahui was found to be in possession of 1.5 grams of cocaine at a port of entry. *Id.* at *2. But there was no indication that Moreno Bacahui was ever charged or convicted of the alleged drug offense, which had occurred seven years before his removal proceedings. The only infraction on his record involved failing to appear in state court after a traffic incident. *Id.* Moreno Bacahui was also married to a U.S. citizen who had filed a visa petition on his behalf. *Id.* Once again, there is a wide gulf between the negative equities of the alien who was granted voluntary departure and Valdez-Novoa's negative equities at the time of his removal proceedings.

We do not think the cases cited by our dissenting colleague show that it is plausible, rather than merely possible or conceivable, that Valdez-Novoa would have received voluntary departure relief. In *In re Pineda-Castellanos*, 2005 WL 3833024 (BIA Nov. 16, 2005), the alien had "convictions for illegal entry, battery, drunkenness, threatening, a second battery, and driving under the influence." *Id.* at *1. Valdez-Novoa similarly had been twice

convicted of driving under the influence, but he was also saddled with convictions for two felonies that caused serious injury to others. Furthermore, the Board observed in *Pineda-Castellanos* that "[g]iven the respondent's criminal record, a grant of voluntary departure by the Immigration Judge was *more than generous*." *Id.* at *2 (emphasis added). The Board's intimation that *Pineda-Castellanos* represents the outer bound of voluntary departure relief does not lead us to believe that it is plausible that Valdez-Novoa would have received the same relief despite his more serious criminal record. We are likewise unmoved by cases where the Board has merely agreed to remand to the IJ to *consider* whether to grant voluntary departure to aliens with fewer negative equities than Valdez Novoa because such remands tell us little about the Board's standards or practices. *See In re Tipaz-Poncio*, 2014 WL 1401572, at *1 (BIA Mar. 19, 2014) (remanding to the IJ to consider whether to grant voluntary departure to an alien who had been convicted of "Class A" assault with family violence and sentenced to forty-five days in prison); *In re Toledo-Alvarado*, 2014 WL 1278406, at *1 (BIA Feb. 26, 2014) (remanding to the IJ to consider whether to grant voluntary departure to an alien who had been convicted of attempted theft and sentenced to one year in prison); *In re Villalongja Mante*, 2007 WL 1676929, at *1–3 (BIA May 18, 2007) (remanding to the IJ to consider whether to grant voluntary departure to an alien who had been convicted of sexual battery and sentenced to "a relatively brief period of felony probation"); *In re Reyes-Jiminez*, 2004 WL 2418597, at *2 (BIA Oct. 4, 2004) (remanding to the IJ to consider whether to grant voluntary departure to an alien who had been sentenced to ten days in prison for disorderly conduct, thirty-one days in prison for second-degree burglary, and one year in prison for driving under the influence). We are equally unpersuaded by cases where the Board has

remanded to the IJ to *consider* whether to grant voluntary departure to *lawful permanent residents* with criminal histories. *See In re Guillermo Ramirez*, 2005 WL 698425, at *1–2 (BIA Mar. 8, 2005) (remanding to the IJ to consider whether to grant voluntary departure to a lawful permanent resident who did not have "any recent criminal convictions" but who had "committed at least two serious crimes, involving controlled substances and robbery, provided a false name to law enforcement authorities at least once, stealing the identity of a friend in the process, and was arrested on a different occasion for driving under the influence"); *In re Hernandez-Barreto*, 2004 WL 2943517, at *1–2 (BIA Oct. 29, 2004) (remanding to the IJ to consider whether to grant voluntary departure to a lawful permanent resident who had been convicted of inflicting corporal injury upon a spouse, possession of a controlled substance, and driving under the influence, for which he received a 150-day suspended sentence and probation). Finally, our position is bolstered rather than undercut by the citation to *In re Ortiz-Bustos*, 2014 WL 1652408 (BIA Apr. 10, 2014), where the Board affirmed the IJ's denial of voluntary departure to an alien who had been twice convicted of driving under the influence. *Id.* at *1.

Our survey of BIA decisions fails to reveal a single case where an IJ granted voluntary departure to an alien with a criminal history as recent and serious as the record compiled by Valdez-Novoa. An IJ would have considered the fact that the conduct that led to Valdez-Novoa's two felony convictions could have resulted in serious injury or death. *See Arguelles-Campos*, 22 I. & N. Dec. at 817 (instructing IJs to consider, among other things, "the existence, seriousness, and recency of any criminal record; and other evidence of bad character or the undesirability of the applicant as a permanent

resident"). His two convictions for driving under the influence would have also weighed heavily on the IJ even though they were misdemeanors. *See In re Romero-Reyes*, 2010 WL 3780635, at \*1 (BIA Sept. 9, 2010) ("We note that driving under the influence is a very dangerous crime which may cause serious injury or death to innocent bystanders."). The fact that Valdez-Novoa twice violated the conditions of his parole after his first stint in prison would have likewise cautioned the IJ against granting voluntary departure relief. *See id.* ("We are further troubled by the fact that [the alien] apparently violated his probation more than once."). And the IJ would have likely been influenced by the fact that Valdez-Novoa's conviction for felony reckless driving occurred after the INS initiated removal proceedings against him. *See In re Abrahan Castillo*, 2009 WL 638918, at \*1 (BIA Feb. 23, 2009) ("The Immigration Judge denied voluntary departure in this case due to the respondent's history of criminal offenses, which includes a violent offense that occurred after the respondent was placed in proceedings.").

Of the cases available to us, the facts of *Gonzales-Figeroa* are the most difficult to distinguish given the alien's similarly lengthy criminal record. But the existence of a single case that is arguably on point means only that it is "possible" or "conceivable" that a similarly situated alien would be afforded voluntary departure. That is plainly insufficient to warrant a finding that the defendant was prejudiced by the IJ's failure to advise him of his apparent eligibility for voluntary departure. *See Barajas-Alvarado*, 655 F.3d at 1089 ("[E]stablishing 'plausibility' requires more than establishing a mere 'possibility.'"); *Cisneros-Resendiz*, 656 F.3d at 1018 (requiring the alien to demonstrate that "it was plausible (not merely conceivable) that the IJ would have exercised his discretion in the alien's favor" (citation omitted)).

We do not discount the fact that Valdez-Novoa had spent most of his life in the U.S. and that his parents and siblings lived in the country. Although there is no indication that Valdez-Novoa was married or had children in 1999, we acknowledge that the presence of family members who are citizens or lawful permanent residents is an important positive equity. Yet it is hardly dispositive. On numerous occasions, the BIA has affirmed an IJ's decision to deny voluntary departure relief where the alien claimed equally compelling ties to the U.S. *See, e.g.*, *In re Velasquez-Garcia*, 2012 WL 1495500, at *1 (BIA Mar. 22, 2012) (denying voluntary departure where the alien had been convicted of possession of cocaine even though "several of his family members are United States citizens"); *In re Garcia-Marquez*, 2012 WL 911851, at *1 (BIA Mar. 9, 2012) (denying voluntary departure where the alien had been arrested for unlawful animal fighting and alien smuggling and had been convicted of DUI despite "his long residence in the United States [and] his family and community ties here"); *In re Posadas-Posadas*, 2012 WL 371659, at *1 (BIA Jan. 18, 2012) (denying voluntary departure where the alien had been arrested for DUI and two subsequent driving-related offenses despite his "family ties and length of stay in the United States"); *In re Ponce-Velez*, 2011 WL 1570481, at *1–2 (BIA Mar. 31, 2011) (denying voluntary departure where the defendant had been convicted of DUI and driving without a license and failed to appear in court for six years despite the fact that he had "been in the United States for 13 years . . . [and] has 3 United States citizen children").

We conclude that Valdez-Novoa has not shown that it is plausible that an IJ would have granted his request for voluntary departure in light of his negative and positive equities when he was deemed removable on June 11, 1999,

even if he had not been deemed statutorily ineligible for voluntary departure as a consequence of the IJ's determination that he had been convicted of an aggravated felony. As a result, Valdez-Novoa was not prejudiced by the IJ's failure to advise him of his apparent eligibility for voluntary departure relief. It follows that the entry of the IJ's order was not "fundamentally unfair" under § 1326(d)(3). The 1999 removal order is thus a valid predicate to a conviction for attempted illegal entry under § 1326(a).

### III

Valdez-Novoa's second argument on appeal is that the district court erred by denying his motion for judgment of acquittal on the basis that the government did not provide evidence sufficient to corroborate his confession under the *corpus delicti* rule. We review the denial of a motion for judgment of acquittal *de novo*, and "ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Corona-Garcia*, 210 F.3d 973, 978 (9th Cir. 2000) (internal quotation marks and citation omitted).

## A. *Attempted Illegal Reentry and the* Corpus Delicti *Rule*

In *United States v. Gracidas-Ulibarry*, 231 F.3d 1188 (9th Cir. 2000) (en banc), we held that

> the elements of the crime of attempted illegal reentry into the United States under 8 U.S.C. § 1326 are: (1) the defendant had the purpose, i.e., conscious desire, to reenter the United States without the express consent of the

> Attorney General; (2) the defendant committed an overt act that was a substantial step towards reentering without that consent; (3) the defendant was not a citizen of the United States; (4) the defendant had previously been lawfully denied admission, excluded, deported or removed from the United States; and (5) the Attorney General had not consented to the defendant's attempted reentry.

*Id.* at 1196. Valdez-Novoa confessed to all of the elements of the offense in a videotaped interview with DHS Criminal Enforcement Officer Sue Curtis that was shown to the jury at trial. Valdez-Novoa told Curtis that he was attempting to enter the U.S. without requesting permission to do so. He confessed that he had purchased an identification card bearing another man's name to use to enter the country. He also acknowledged that he had previously been removed on several occasions. And, in Section II, *supra*, we confirmed that the 1999 removal order was lawful under § 1326(d).

But Valdez-Novoa's confession standing alone is not necessarily sufficient to support his conviction. "Although the government may rely on a defendant's confession to meet its burden of proof, it has nevertheless been long established that, in order to serve as the basis for conviction, the government must also adduce some independent corroborating evidence." *Corona-Garcia*, 210 F.3d at 978. This is the contemporary iteration of the common law *corpus delicti* rule. In *United States v. Lopez-Alvarez*, 970 F.2d 583 (9th Cir. 1992), we considered the ongoing vitality of the *corpus delicti* principle in light of a trio of decisions by the Supreme Court: *Opper v. United States*, 348 U.S. 84 (1954);

*Smith v. United States*, 348 U.S. 147 (1954); and *Wong Sun v. United States*, 371 U.S. 471 (1963). We held that these cases stand for the proposition that "the state no longer need introduce independent, tangible evidence supporting every element of the corpus delicti. Instead, the state is required to support independently only the gravamen of the offense—the existence of the injury that forms the core of the offense and a link to a criminal actor—with tangible evidence." *Lopez-Alvarez*, 970 F.2d at 591.

B. *The Gravamen of Attempted Illegal Reentry*

Pursuant to our decision in *Lopez-Alvarez*, we must first identify the gravamen of the offense. In *Corona-Garcia*, we considered whether the government introduced sufficient independent evidence of the *corpus delicti* in a case where the defendant was convicted of illegal entry in violation of § 1326(a). *Corona-Garcia*, 210 F.3d at 977–79. We held that "[t]he gravamen of the offense in this case—that is to say the conduct at the core of the offense—is entry." *Id.* at 978. We "expressly reject[ed] [the defendant's] contention that 'illegal entry' is the gravamen of the offense." *Id.* at 978 n.3. This case differs from *Corona-Garcia* because Valdez-Novoa was convicted of *attempted* illegal entry, rather than the completed offense. Unlike *Corona-Garcia*, who was serving time in a California state prison for an unrelated offense when the government concluded that he had illegally entered the U.S., Valdez-Novoa never made it past the San Ysidro Port of Entry. Both attempted illegal reentry and the completed version of the offense are prohibited by § 1326(a). But they differ in one important respect: attempted illegal reentry is a specific intent crime, while the completed offense is not. *See Gracidas-Ulibarry*, 231 F.3d at 1191–92 ("We hold that the attempt prong of § 1326 incorporates the well-established

common law meaning of 'attempt' and requires proof of a specific intent to enter illegally."); *United States v. Flores-Villar*, 536 F.3d 990, 999 (9th Cir. 2008) ("Attempted illegal entry . . . is a specific intent crime, but . . . illegal reentry and being found in the United States is not."). Because the government must introduce "proof of a specific intent to enter illegally," *Gracidas-Ulibarry*, 231 F.3d at 1192, the gravamen of the offense is attempted *illegal* entry rather than attempted entry.

## C. *Evidence Corroborating Valdez-Novoa's Confession*

We apply a two-pronged test to determine whether sufficient evidence corroborates Valdez-Novoa's confession:

> [F]irst, although the state need not introduce independent evidence of the corpus delicti in conformance with the traditional test, it must introduce sufficient evidence to establish that the criminal conduct at the core of the offense has occurred. Second, it must introduce independent evidence tending to establish the trustworthiness of the admissions, unless the confession is, by virtue of special circumstances, inherently reliable.

*Lopez-Alvarez*, 970 F.2d at 592.

With respect to the first prong, Valdez-Novoa argues that his presence in secondary screening at the San Ysidro Port of Entry does not corroborate his confession that he was attempting to enter the U.S. without permission. An alien could wind up in secondary screening even though he lacked the specific intent to enter the U.S. without permission. For

example, he might approach a port of entry to seek asylum, or he might be under the mistaken assumption that he has been granted permission to reenter. Under those circumstances, the alien would not have committed the gravamen of the offense of attempted illegal entry in violation of § 1326(a). *See Gracidas-Ulibarry*, 231 F.3d at 1194. Valdez-Novoa is correct that his presence in secondary screening, standing alone, does not prove that he was attempting to reenter the U.S. without permission.

But the *corpus deliciti* rule does not require the government to introduce evidence that would be independently sufficient to convict the defendant in the absence of the confession. Rather, it requires evidence sufficient to corroborate the defendant's confession. *See Smith*, 348 U.S. at 156 ("All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused."); *Corona-Garcia*, 210 F.3d at 979 ("Although it is true that the sum total of this evidence might well be insufficient, standing alone, to prove entry, we do not read *Opper* or *Lopez-Alvarez* to require such absolute proof. Indeed, *Opper* and *Lopez-Alvarez* require corroboration of the defendant's confession—that is to say evidence that fortifies, augments, or supports it—from which a jury may infer that the defendant's confession was a trustworthy admission to core conduct that actually occurred."); *Thomas v. United States*, 370 F.2d 621, 623 n.3 (9th Cir. 1967) ("[I]n those cases where the crime involves no tangible corpus delicti, the corroborative evidence need show no more than the trustworthiness of the admission or confession—it need not show the actual commission of the crime.").

The government introduced ample independent evidence that corroborates Valdez-Novoa's statement that he committed the gravamen of the offense of attempted illegal reentry. First, Valdez-Novoa confessed that he had been removed to Mexico one month before he attempted to reenter the U.S. At trial, Customs and Border Patrol Officer Bianca Marcel testified that, according to Valdez-Novoa's immigration file, he was removed to Mexico on January 18, 2011. The warrant of removal in Valdez-Novoa's file was in fact signed on January 18, 2011. That is almost exactly one month before he was detained while attempting to enter the U.S. at the San Ysidro Port of Entry on February 16, 2011. Valdez-Novoa also confessed that he was first ordered removed in 1999 in proceedings that occurred in San Francisco. Officer Marcel testified that, according to Valdez-Novoa's immigration file, he was deemed removable on June 11, 1999, and removed to Mexico on June 15, 1999. The warrant of removal in Valdez-Novoa's file reflects the same information, and the IJ's decision was issued in San Francisco on June 11, 1999. Finally, Valdez-Novoa confessed that he had not applied for permission to return to the U.S. Officer Marcel testified that an alien can request permission to reenter the U.S., but that Valdez-Novoa's immigration file revealed that he had not done so. The documentary evidence is indeed devoid of any indication that Valdez-Novoa requested permission to reenter the U.S.

All of this "independent evidence [ ] bolster[s] the confession itself and thereby prove[s] the offense 'through' the statements of the accused," *Smith*, 348 U.S. at 156, by showing that Valdez-Novoa was attempting to enter the U.S. without permission after having been previously removed. We relied on the same kind of corroborative evidence in *Lopez-Alvarez*. For example, we explained that "the details

of the crimes provided by the defendant are verified by independent evidence" because the defendant confessed to using iron pipes to beat the victim, which was "consistent with the condition of the body." *Lopez-Alvarez*, 970 F.2d at 593. The defendant also discussed a tape recording of an exchange between the victim and several other men. *Id.* The government introduced the recording, "and its contents matched the defendant's general description." *Id.* Likewise, the details of Valdez-Novoa's confession matched the record evidence introduced by the government. As in *Lopez-Alvarez*, "we believe that the admissions were supported by credible evidence, that a jury would be substantially justified in believing them, and that they were therefore sufficiently reliable to support a conviction." *Id.*

With respect to the second prong of the *Lopez-Alvarez* inquiry, we conclude that the government "introduce[d] independent evidence tending to establish the trustworthiness of the admissions." *Id.* at 592. As noted, Officer Marcel's testimony concerning Valdez-Novoa's immigration file and the contents of the file itself confirmed the accuracy of the statements that Valdez-Novoa made to Officer Curtis at the San Ysidro Port of Entry. The same evidence that corroborates Valdez-Novoa's confession to having committed the gravamen of the offense also verifies the "trustworthiness of the admissions." *Id.* We have previously relied on more attenuated corroborating evidence in deeming a confession trustworthy under the second prong of the *Lopez-Alvarez* analysis. In *Corona-Garcia*, we reasoned that the defendant's confession that he reentered the U.S. at the Calexico Port of Entry was corroborated by the fact that he had been previously removed through the same port of entry. *Corona-Garcia*, 210 F.3d at 979. Here, the independent evidence introduced by the government matched very specific details

offered by Valdez-Novoa about his immigration history during his interview with Officer Curtis. Valdez-Novoa's confession also included specific details about how he used another man's identification to attempt to enter the country without permission, including the name of the woman who sold him the identification and how he intended to pay her after crossing. The specificity of his account further bolsters its trustworthiness by making it even more implausible that Valdez-Novoa found himself in secondary screening without intending to reenter the U.S. without permission.

Furthermore, the confession in this case can be considered "inherently reliable," *Lopez-Alvarez*, 970 F.2d at 592, because it was videotaped, voluntary, and occurred after Officer Curtis advised Valdez-Novoa of his *Miranda* rights. At bottom, the *corpus delicti* doctrine's "purpose is to prevent errors in convictions based upon untrue confessions alone" in light of the reality that "[c]onfessions may be unreliable because they are coerced or induced." *Smith*, 348 U.S. at 153 (quotation marks and citation omitted). Where the government complies with all of the procedural protections afforded the accused and the defendant's videotaped statement is shown to the jury, there is no elevated risk that the confession was the product of coercion or that the defendant's words were misconstrued. The *corpus delicti* rule is not inevitably satisfied whenever a confession is not tainted by a constitutional violation or any indicia of undue coercion. The government is still obligated to "introduce sufficient evidence to establish that the criminal conduct at the core of the offense has occurred" in order to satisfy the first prong of the *Lopez-Alvarez* inquiry. But the fact that the confession is recorded, voluntary, and the result of an interrogation that is conducted in a manner consistent with the constitutional protections afforded the accused supports

a determination that it is "inherently reliable" under *Lopez-Alvarez*'s second prong.

We conclude that the government introduced sufficient independent evidence to corroborate Valdez-Novoa's confession to attempting to enter the U.S. without permission after having been previously removed. Because the evidence adduced at trial satisfied the *corpus delicti* doctrine, the district court correctly denied Valdez-Novoa's motion for judgment of acquittal.

IV

We affirm the district court's judgment. First, we conclude that the IJ's June 11, 1999, order deeming Valdez-Novoa removable is a valid predicate to his conviction for violating § 1326(a). The IJ's determination that Valdez-Novoa had been convicted of an aggravated felony and was therefore statutorily ineligible for voluntary departure does not constitute a due process violation because it was not contrary to our precedent at the time the removal order was entered and involved a reasonable reading of 18 U.S.C. §16. Alternatively, even if we assume *arguendo* that the IJ erred in determining that Valdez-Novoa was not apparently eligible for voluntary departure relief, we hold that Valdez-Novoa was not prejudiced by the error because he has not shown that it is plausible that an IJ would have granted a request for voluntary departure in light of his negative and positive equities at the time of the removal proceedings. Because Valdez-Novoa was not prejudiced by the presumed error, the removal order was not "fundamentally unfair" under § 1326(d)(3). Second, we conclude that the government introduced ample independent evidence corroborating Valdez-Novoa's confession to attempting to enter the U.S.

without permission after having been previously removed to satisfy the *corpus delicti* rule. The district court correctly denied both Valdez-Novoa's motion to dismiss the indictment and his motion for judgment of acquittal. The judgment of the district court is **AFFIRMED**.

---

Judge McKEOWN, Circuit Judge, dissenting:

I respectfully dissent. As the majority notes, Valdez-Novoa's case turns on whether the Immigration Judge's ("IJ's") failure to advise him of his apparent eligibility for voluntary departure was a due process violation and whether that violation was prejudicial. I write separately because the government earlier conceded that there was a due process violation, and because the majority elevates our benchmark for prejudice, the "plausibility" inquiry, to the higher standard of either preponderance or probability. Because it is plausible that the IJ would have exercised discretion to grant voluntary departure, I would reverse the district court's judgment.

Before the district court, the government conceded that there was a "due process violation, in light of later–developing case law," and focused its argument solely on the prejudice issue. The court implicitly accepted the violation as conceded, and it too addressed only prejudice. The government has now entirely changed its position, and maintains on appeal that there was no due process violation in the earlier proceedings.

The majority reasons that we may reach the government's novel argument under an exception permitting us, in certain conditions, to reach "[i]ssues not presented to the district

court . . . [and presented] for the first time on appeal." *United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990). But this is not an issue that is being raised for the first time on appeal. To the contrary, the issue was squarely before the district court, and the government affirmatively abandoned it. Waiver or judicial estoppel are the appropriate doctrines. To ignore those doctrines is to permit a party to relitigate an issue already abandoned.[1]

Nor does this situation fall, as the government suggests, under the intervening law exception. The government argues that the law changed between the district court proceeding in 2011 and this appeal, citing *United States v. Vidal-Mendoza*, 705 F.3d 1012 (9th Cir. 2013). This argument fails because *Vidal-Mendoza* did not "fundamentally alter[] the applicable law." Indeed, the language the government cites from *Vidal-Mendoza* comes from *United States v. Lopez-Velasquez*, 629 F. 3d 894 (9th Cir. 2010) (en banc), which was decided three years earlier and before Valdez-Novoa was even

---

[1] *See, e.g.*, *Export Grp. v. Reef Indus., Inc.*, 54 F.3d 1466, 1470-71 (9th Cir. 1995) (holding that a party waived the right to allege contrary facts on appeal, *e.g.* that defendant was not an agent or instrumentality of the Mexican government for sovereign immunity purposes, where the party alleged that the defendant was an agent or instrumentality in its complaint); *see also New Hampshire v. Main*e, 532 U.S. 742, 749 (2001) (noting that "judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase") (internal quotation marks omitted); *id.* at 750 (noting that the purpose of estoppel is to "prohibit[] parties from deliberately changing positions according to the exigencies of the moment" (internal quotation marks omitted)).

indicted.[2] The government should not be permitted to resurrect on appeal an argument that it affirmatively jettisoned before the district court.

We should not countenance a change in position simply because the government has changed its mind. To do so would make every appeal a jump ball situation in which the appeal is just another chance to raise a new issue and tip the litigation game in one party's favor without regard to what happened in the trial court. This approach is particularly unfair when the appellee adopts a contradictory position on appeal, since the appellant has no warning and cannot tailor its opening brief to meet the argument. The circumstance here is nothing more than the government's created "exigenc[y] of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). To the extent we have discretion to entertain the government's about-face, we should decline to do so here. To do otherwise makes a sham of the principles of waiver and estoppel.

The majority concludes, in the alternative, that Valdez-Novoa was not prejudiced by the due process violation. I likewise disagree with this conclusion. To establish prejudice, Valdez-Novoa "does not have to show that he actually would have been granted relief. Instead, he must only show that he had a 'plausible' ground for relief from deportation." *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1048 (9th Cir.

---

[2] Because, in my view, Valdez-Novoa had not "previously been lawfully . . . removed," I would likewise hold that the fourth element of the crime of illegal reentry here was not satisfied, *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000) (en banc), for purposes of the *corpus delicti* rule.

2004) (quoting *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000)).**[3]**

Although our cases reference the "plausibility" standard, we have yet to define it with precision. We have set a floor: "establishing 'plausibility' requires more than establishing a mere 'possibility.'" *United States v. Barajas-Alvarado*, 655 F. 3d 1077, 1089 (9th Cir. 2011). We have also explained, in the context of a § 212(h) waiver, that while the evidence did not guarantee a waiver, "it provide[d] the 'something more' that ma[de] it plausible." *Arrieta*, 224 F.3d at 1082–83. While citing earlier cases, the majority fails to articulate an actual plausibility standard. I agree with the majority that the standard is not, as Valdez-Novoa advocates, whether it would have been an abuse of discretion for an IJ to grant voluntary departure. But neither do our cases require a petitioner to find a case that is "on all fours" with his own to demonstrate plausibility. That would elevate our plausibility standard to a probability standard.

Two Supreme Court decisions underscore that the plausibility bar is low and, at the very least, that it does not rise to the level of "probability." The Court's formulation in *Armour v. City of Indianapolis* is instructive: a "plausible reason" is one in which "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." 132 S. Ct. 2073, 2080 (2012) (internal citation

---

**[3]** Other circuits have adopted different standards for demonstrating prejudice. *See, e.g.*, *United States v. Charleswell*, 456 F.3d 347, 362 n.17 (3d Cir. 2006) (adopting a "reasonable likelihood" standard); *United States v. Aguirre-Tello*, 353 F.3d 1199, 1209 (10th Cir. 2004) (same); *United States v. Copeland*, 376 F.3d 61, 74 (2d Cir. 2004) (adopting a "reasonable likelihood" or "reasonable probability" standard).

and quotation marks omitted). Similarly, in *Ashcroft v. Iqbal*, the Court specified that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." 556 U.S. 662, 678 (2009). Considering the Supreme Court's formulation coupled with our precedent, I believe that our "plausibility" standard is best understood as more than a mere possibility but less than a probability: in short, as "reasonably conceivable or possible."

In considering whether to grant voluntary departure, immigration judges are required, as the majority acknowledges, to "weigh favorable and unfavorable factors." *Campos-Granillo v. INS*, 12 F.3d 849, 852 (9th Cir. 1993). Favorable factors include

> family ties within the United States; residence of long duration in this country, particularly if residence began at a young age; hardship to the petitioner or petitioner's family if relief is not granted; service in the United States armed forces; a history of employment; the existence of business or property ties; evidence of value and service to the community; proof of rehabilitation if a criminal record exists; and other evidence attesting to good character.

*Id.* at 852 n.8.

Valdez-Novoa met a number of these criteria in 1999. At that time, Valdez-Novoa had a plausible claim for relief based on his arrival in the United States as a nine-year-old boy and his continuous residence for sixteen years between his arrival

and deportation in 1999; his three U.S. citizen siblings, his mother and father who held legal permanent resident ("LPR") status and his five additional siblings, all of whom ultimately gained legal status; and his educational certification as a welder and his extensive employment history as a welder, field worker, and fence repairer.[4]

To be sure, Valdez-Novoa has an extensive criminal history, much of it stemming directly from his past abuse of alcohol. But the BIA has supported voluntary departure, or remanded to the IJ to consider whether to grant voluntary departure, for aliens with extensive criminal records, including alcohol-related crimes. The BIA has done so in cases involving, among others, six criminal convictions including battery, drunkenness, threatening, and driving under the influence, *In re Pineda-Castellanos*, 2005 WL 3833024 (BIA Nov. 16, 2005); attempted theft, *In re Toledo-Alvarado*, 2014 WL 1278406 (BIA Feb. 26, 2014); "Class A" assault with family violence, *In re Tipaz-Poncio*, 2014 WL 1401572 (BIA Mar. 19, 2014); two convictions for driving while intoxicated, one "recent," *In re Ortiz-Bustos*, 2014 WL 1652408 (BIA Apr. 10, 2014); four convictions for assault, a conviction for resisting arrest, and numerous arrests, purportedly as a result of alcohol abuse, *In re. Gonzales-Figeroa*, 2006 WL 729784 (BIA Feb. 10, 2006); a conviction for sexual battery, *In re Villalongja Mante*, 2007 WL 1676929 (BIA May 18, 2007); convictions for "two serious crimes[] involving controlled substances and robbery" and an arrest for driving under the influence, *In re Guillermo*

---

[4] Interestingly, though not part of a retrospective analysis, had the IJ taken a chance on Valdez-Novoa, it would have turned out to be a good one. Valdez-Novoa has been sober since 2007, and now has a U.S. citizen wife and three citizen children.

*Ramirez*, 2005 WL 698425 (BIA Mar. 8, 2005); convictions for domestic violence, possession of a controlled substance, and driving under the influence, *In re Hernandez-Barreto*, 2004 WL 2943517 (BIA Oct. 29, 2004); and convictions for driving under the influence, burglary, and disorderly conduct, *In re Reyes-Jiminez*, 2004 WL 2418597 (BIA Oct. 4, 2004). These cases underscore the wide range of cases in which the BIA has determined that it was appropriate to consider the exercise of discretion. They fall squarely in the category of plausible relief. The majority's backhanded dismissal of these cases simply underscores that it is elevating the plausibility standard to one of preponderance or probability.

I highlight cases involving alcohol and violence like battery or domestic violence to illustrate that the BIA has exercised its discretion to grant voluntary departure in a wide range of cases involving criminal histories that equal or exceed that of Valdez-Novoa. Of course, we cannot know for certain whether the BIA would have done so here, but this is not our charge. The question before us is not whether Valdez-Novoa would probably or inevitably have been granted relief, but only whether, at the time his rights were violated, he had a "plausible" ground for relief. Detailing, as the majority does, cases in which the BIA chose not to exercise its discretion underscores only that the choice to grant or not lies with the BIA. Those cases do not prove, given the ranks of cases similar to Valdez-Novoa's in which relief was granted, that relief was not "plausible." When considered in light of the substantial positive factors, the combination of favorable and unfavorable factors easily satisfies a standard of "plausibility" for relief from deportation. Valdez-Novoa has established prejudice under *Ubaldo-Figueroa*, 364 F.3d at 1048.

The existence of such a wide range of cases—both granting and denying relief—only highlights that the BIA and IJs have taken a broad view of when to grant voluntary departure. I fear that the panel's contrary result in this case turns the plausibility standard into something it was never intended to be: a preponderance or probability standard. The standard is low because the affront inherent in the violation is great. Without a true plausibility standard and the remedy of dismissal of the indictment, there would be no effective deterrent to due process violations in this context. I therefore respectfully dissent.